## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

**JOSHUA BRANDON PILLAULT**                                             **MOVANT**

**v.**                                             **No. 3:12CR131-MPM-JMV**

**UNITED STATES OF AMERICA**                                             **RESPONDENT**

## MEMORANDUM OPINION

This matter comes before the court on the motion of Joshua Brandon Pillault to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. The government has responded to the motion, and the matter is ripe for resolution. For the reasons set forth below, the instant motion to vacate, set aside, or correct sentence will be denied.

### *Habeas Corpus* Relief Under 28 U.S.C. § 2255

The writ of *habeas corpus*, a challenge to the legal authority under which a person may be detained, is ancient. Duker, The English Origins of the Writ of Habeas Corpus: A Peculiar Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St. John's L.Rev. 55 (1934). It is "perhaps the most important writ known to the constitutional law of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is equally significant in the United States. Article I, § 9, of the Constitution ensures that the right of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or invasion, public safety may require it. *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56. Its use by the federal courts was authorized in Section14 of the Judiciary Act of 1789. *Habeas corpus* principles developed over time in both English and American common law have since been codified:

The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the

1948 Judicial Code. The recodification of that year set out important procedural limitations and additional procedural changes were added in 1966. The scope of the writ, insofar as the statutory language is concerned, remained essentially the same, however, until 1996, when Congress enacted the Antiterrorism and Effective Death Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners and setting out special, new *habeas corpus* procedures for capital cases. The changes made by the 1996 legislation are the end product of decades of debate about *habeas corpus*.

*Id*.

## Section 2255 Proceedings

Section 28 U.S.C. § 2255 permits an inmate serving a sentence after conviction of a federal crime "to move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). As with the writ of *habeas corpus*, *see* 28 U.S.C. §§ 2241, 2254, a § 2255 motion sets forth only four bases on which a motion may be made: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the court was without jurisdiction to impose the sentence; (3) the sentence exceeds the statutory maximum sentence; or (4) the sentence is "otherwise subject to collateral attack." 28 U.S.C. § 2255(a). Thus, a prisoner must claim either a constitutional violation or want of subject matter jurisdiction to invoke 28 U.S.C. § 2255. In the absence of constitutional or jurisdictional defects, a federal prisoner may invoke § 2255 only if the error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Addonizio,* 442 U.S. 178, 185 (1979).

The district court must first conduct a preliminary review of a section 2255 motion, and "[i]f it plainly appears from the motion, any attached exhibits, and the record of the prior proceeding that the moving party is not entitled to relief, the judge must dismiss the motion." Rules Governing Section 2255 Proceedings, Rule 4(b). If the motion raises a non-frivolous claim to relief, the court must order the Government to file a response or to take other appropriate action. *Id.* The judge may then require

the parties to expand the record as necessary and, if good cause is shown, authorize limited discovery. *Rules Governing Section 2255 Proceedings,* Rules 6–7.

After reviewing the government's answer, any transcripts and records of prior proceedings, and any supplementary materials submitted by the parties, the court must decide whether an evidentiary hearing is warranted. *Rules Governing Section 2255 Proceedings,* Rule 8. Under the statute, an evidentiary hearing must be held unless "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). However, the court need not hold an evidentiary hearing if the prisoner fails to produce "independent indicia of the likely merit of [his] allegations." *United States v. Edwards,* 442 F.3d 258, 264 (5th Cir. 2006) (quoting *United States v. Cervantes,* 132 F.3d 1106, 1110 (5th Cir. 1998)).

Ultimately, the petitioner bears the burden of establishing his claims of error by a preponderance of the evidence. *See Wright v. United States,* 624 F.2d 557, 558 (5th Cir. 1980). For certain "structural" errors, relief follows automatically once the error is proved. *See Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003). For other errors at the trial court level, the court may grant relief only if the error "had substantial and injurious effect or influence" in determining the outcome of the case. *Brecht v. Abrahmson,* 507 U.S. 619, 637 (1993); *see also United States v. Chavez,* 193 F.3d 375, 379 (5th Cir. 1999) (applying *Brecht's* harmless error standard in a § 2255 proceeding). If the court finds that the prisoner is entitled to relief, it "shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b).

**Mr. Pillault's Claims**

Joshua Pillault raises four issues with various sub-points. He alleges that he was denied effective assistance of counsel and his rights under the 14th, 1st, and 4th Amendments were violated. None of his arguments has merit.

Mr. Pillault first argues that his Sixth Amendment right to effective assistance of counsel was violated, as well as his right to trial by a fair and impartial jury of his peers, because: (1) he had no attorney when his home was searched, (2) his public defender failed to visit him, (3) he was misled by his attorney, (4) he pled guilty based on his attorney's bad advice, (5) he is actually innocent, (6) his accuser would not testify against him, and (7) his attorney ineffectively cross-examined witnesses during sentencing.

He next argues that his Fourteenth amendment right to due process was violated because arresting officers coerced him into signing away his right to counsel and be interviewed and because defense counsel advised him to plead guilty, resulting in a feeling that he had no defense, and no one was defending his rights.

Third, Mr. Pillault argues that his First Amendment right to freedom of speech was violated because only his mother or parental figure possessed the authority to censor his expressive activities on the internet, and his threatened acts of violence were protected under the First Amendment.

Finally, Mr. Pillault argues that his Fourth Amendment rights were violated by the search of his home at the time of his arrest – and because he was denied an interview for a determination of the facts prior to his arrest and the search of his home.

**Facts and Procedural Posture**[1]

On October 4, 2012, Joshua Pillault, while playing the online multiplayer game "RuneScape" and using the display name "PaulGilbert (Merlan91)," threatened to use firearms, pipe bombs, and Molotov cocktails to recreate the Columbine massacre at Oxford High School in Oxford, Mississippi (ROA.15-17).[2]  Pillault told other players that he planned to commit suicide, but it would be a waste to just kill himself, and that he had to kill other people first (ROA.15).  He stated that he needed to get "at least two guns," and "backup clips, mopolotov(sic) cocktails, [and] pipe bombs" all of which he was going to use to "level oxford hish (sic) school" (ROA.16).  Pillault further stated, "If I have anything to say about it, that school is going to be gravel" (*Id.*).  He went on to state, "look for the last name Pillault on the news 4-20-13….. because 4-20-13 is the anniversary of Columbine" (*Id.*).  Pillault explained that he was consumed by the Columbine Massacre, stating multiple times, "We'll never forget: The Columbine Massacre….Ask me anything about the massacre.  I know it all" (ROA.17).  Pillault continued his threats, stating, "I can't wait to blow brains out of skulls," and "the world is going to know my wrath god dammit" (*Id.*).

These same threats had been communicated to two of Pillault's former girlfriends.  One of these girlfriends, Jane Doe[3], was with him when he made these specific threats on "RuneScape" (ROA.281).  Doe testified that while Pillault was intoxicated at the creation of

---

[1] The court has used the facts set forth by the Government in its response to Mr. Pillault's motion to vacate, set aside, or correct sentence, as those facts are well-documented and uncontested.

[2] Record citations in this memorandum opinion correspond to the Bates page numbers in the Record on Appeal in this case.

[3] The court will not use the actual name of the young girls involved with Mr. Pillault.

these threats, Pillault discussed and planned to carry out the threats when both sober and intoxicated (ROA.281-282).

Another former girlfriend, Susan Roe[4], testified that Pillault had researched at length how to make bombs (ROA.253). Roe drove Pillault to a Home Depot store where he obtained a piece of copper pipe, which he told Roe could be used to make a pipe bomb (ROA.253). Later, Pillault told her that he tested the pipe bomb and it worked. (ROA.254). Pillault had told Roe to stay home from school on April 20, 2013, the anniversary of Columbine (Roe testified she later discovered April 20th would be a Saturday) (Id.).

Doe stated that Pillault was saving money to have someone buy him a gun, and even went to Wal-Mart to look at guns (ROA.282). Doe added that Pillault attempted to make Molotov cocktails out of empty glass Sprite bottles, which did not work properly when tested (ROA. 283).

Both Doe and Roe testified that Pillault had started making plans outside of just drawings and talking. Roe testified that Pillault created plans for the school shooting in a journal (ROA.254). Doe also testified that Pillault devised multiple plans to execute the school shooting. One plan was to break through large plate glass windows at the high school cafeteria, deploy either pipe bombs or smoke bombs, and proceed through the school, spraying bullets as he went. Another plan was to enter near the high school's office entrance, and try to begin the attack by shooting the school principal in the head (ROA.282). Roe said she did not go to the authorities because Pillault told her if she did, he would kill her and her family (ROA.255).

_____

[4] Again, the court has chosen not to use the actual names of the girls associated with Mr. Pillault in this case.

Both Doe and Roe testified that Pillault was obsessed with Columbine and admired the two shooters (ROA.251-252, 284). Doe testified that Pillault told her that he believed that school shootings were sometimes moral and necessary to achieve justice (ROA.252).

On October 4, 2012, the Oxford Police Department received two phone calls alerting them to the threats against Oxford High School made on the "RuneScape" game (ROA.12). The first call came from a person in Virginia who had been playing "RuneScape" at the time and saw the threats being made. The second call came from Jagex Ltd, the London based company that operates "RuneScape" (*Id.*). Jagex provided account information and the messages that contained the threats to the Oxford Police Department (*Id.*). The Internet Protocol (IP) address from which the threats originated, which was provided by Jagex Ltd, was registered to a computer owned by Stacey Pillault, Pillault's mother, and which was located at a residence on Combs St., in Oxford, Mississippi (ROA.12,15). The user account for Internet service was also registered to Stacey Pillault at the same address (ROA.15).

Pillault, who had dropped out of high school and had over 20 disciplinary actions on his school record, was known by Officer Harper Thomas, the Oxford High School resource officer (ROA.473, 259). Officer Thomas told the Oxford Police Department that he was concerned for the safety of the Oxford High School students and that they should take these threats seriously because Pillault was a person who had "very impulsive tendencies, a lot of anger problems…a lot of outbursts and just a lot of anger" (ROA.259-260). On October 5, 2012, Officer Thomas was sent to find Pillault. Extra security was put in place for the Oxford High School football game that night (ROA.515).

On October 8, 2012, the FBI obtained an arrest warrant for Pillault (ROA.18). At the same time, a court authorized search warrant was issued for any electronic device that connected to the internet at his residence (ROA.35). Pillault was arrested later that day at his residence (ROA.18). Pillault admitted to police that he had been playing "RuneScape" on October 4, 2012, under the display name "PaulGilbert(merlan91)" (ROA.515). When the police read the threats to him, Pillault admitted that he probably wrote them but did not remember them because he was drunk (ROA.104). Pillault also admitted to police that he had attempted to download the controversial online game "Super Columbine Massacre RPG," in which players assume the roles of the Columbine shooters and act out the massacre. (*Id.*).

At the same time as the arrest, the FBI also executed the search and seizure warrant (ROA.37). The FBI seized four laptop computers and two cellular telephones from the residence, including the computer Pillault used. (*Id.*). According to the FBI computer examiner, who testified at the sentencing hearing, on Pillault's computer he found a folder named "4chan" (ROA.515). The "4chan" folder contained a folder named "columbine" and a folder named "serialkiller," both of which contained pictures related to the Columbine shooting and the two Columbine shooters, along with other famous serial killers (*Id.*). The "4chan" directory also contained files with instructions on how to make "DIY Thermite," "Carbon Tet" pipe bombs, and how to use a bicycle to ignite a blasting cap (*Id.*). Pillault had also conducted the following Google searches "pipe bomb"; "jolly-rogers cookbook"; "how to make bomb explodes[sic]"; "anarchistcookbook"; and "timothy mcveigh" (ROA.516). Pillault also conducted the following Youtube searches: "tennis ball bomb"; "pipe bomb"; and "Columbine 'shooting' and 'footage'"

(*Id.*).  Pillault also made the following Wikipedia searches: "assault rifle"; "columbine massacre"; and "bomb-making-instructions-on-the-internet" (*Id.*).

On October 17, 2012, a psychiatric examination of Pillault, to be done by a local forensic psychologist, was ordered by the court to determine whether Pillault was competent to stand trial and whether he would be a danger to himself or others if released from prison.   Dr. Cauthern, the psychologist who examined Pillault, found that while very intelligent, he was a "troubled young man" (ROA.364).  The psychologist noted that Pillault had been previously diagnosed with bipolar disorder, as well as cannabis and alcohol abuse (ROA.365).  Cauthern concluded that Pillault was competent to stand trial (ROA.364).  Also, Dr. Cauthern concluded that Pillault was suffering from a major psychiatric disorder and did not understand the seriousness by which the law views threats over the Internet, yet still concluded that Pillault was not a danger to himself or others (ROA.365).

On October 25, 2012, Pillault was charged in a two-count Indictment.  Count One alleged that he knowingly transmitted in interstate and foreign commerce a communication containing a threat to injure the person of another in violation of 18 U.S.C. § 875(c).  Count Two alleged that Pillault knowingly and willfully made a threat to kill and injure individuals and unlawfully damage and destroy buildings and other real and personal property by means of fire and explosives, the threat being communicated through an instrument of interstate and foreign commerce in violation of 18 U.S.C. § 844(e) (ROA.50-51).

On June 20, 2013, Pillault and the United States reached a plea agreement in which he agreed to plead guilty to Count Two of the indictment, which carried maximum possible penalties of 10 years imprisonment, a $250,000 fine, 3 years supervised release, and a special assessment of $100 (ROA. 164-65).

Following Pillault's guilty plea, the United States Probation Service ("Probation") completed a Presentence Investigation Report assigning a total offense level of 15. The probation officer used the 2012 Sentencing Guidelines Manual and, applying Section 2A6.1(a)(1) with a base offense level of 12, adding 6 points for conduct evidencing intent to carry out such threat under specific offense characteristic 2A6.1(b)(1), arrived at the initial base offense level of 18 (ROA.517, PSR, ¶¶ 26-27). Probation reduced the offense level by 3 points for Pillault's acceptance of responsibility under sections 3E1.1(a) and (b) (ROA.518, PSR ¶¶ 33-34). Pillault was assigned a criminal history category of I, based on a Possession of Marijuana conviction in 2011 (ROA.518-519, PSR, ¶¶ 38-39). Based upon a total offense level of 15 and a criminal history category of I, Pillault's Sentencing Guideline incarceration range was 18 to 24 months (ROA.522, PSR, ¶ 67).

While held in custody, Pillault wrote and illustrated pages of personal notes and drawings. These notes and drawings were seized by jail officials after a cell mate warned government officials of their existence (ROA.366). While the notes and drawings consisted mainly of innocent drawings and song lyrics, there were a sizeable number of disturbing drawings and notes. The drawings depict guns, heads exploding after being shot, a person holding a pipe bomb and gun, a person holding a shotgun, a person with an arrow through his head, a person committing suicide in a jail cell, and other violent images (ROA.369). The notes describe in graphic detail the rape, torture, and murder of women and how the women deserved the treatment. For example, one read: "So to the girls in this song, who feel like they were done wrong … Fuck you stupid hoes, You deserved it all along" (ROA.369, 373, 378, 387).

Many of the threats and comments appear to be directed at his ex-girlfriend Jane Doe (ROA.369, 373, 387-88, 404). For example, he wrote: "So listen up, bitch. Here's your warning,

stay back" and "Then I'm coming for you, you can't hide I swear.  I'll cut that neck open til you're gurgling for air" (ROA.404).

There are also writings about a dream in which one of the Columbine shooters gave Pillault his weapon, a Tec. 9 semi-automatic nine millimeter handgun (ROA.381).  Pillault described killing "fucking teachers and spraying everyone" (ROA.381).  Pillault wrote that he dreamt of murder every once in a while, "it makes me smile…that type of power would drive you wild" (*Id.*).  Pillault continued, from the point of view of Eric Harris:  "I made Jesus raise his hands and pray to be saved.  Danger to mixed company, shoot everyone in front of me… Their bodies slumping see… Gun to a bitch's dome and give her a choice.  Take a clip inside the lip, bitch, or swallow my boys… Telling me I'll go to prison if I try to murder ya. Fuck that!  I'd rather slit both these wrists, stick my knife in my spinal cord and give it a twist" (ROA.407).

The District Court, desiring more information as to the mental condition of Pillault prior to sentencing, ordered a psychiatric/psychological examination of Pillault to be conducted by the United States Bureau of Prisons (ROA.167-68).  The evaluation was completed by Dr. Heather Ross.  Dr. Ross found that Pillault had been abusing alcohol and drugs since he was 14 years old (ROA.222-223).  A typical day of drug and alcohol use for Pillault started with smoking two "bowls" of marijuana and drinking nearly half a fifth of vodka when he woke up (ROA.225).  His girlfriend would come over later in the day and they would finish the fifth of vodka and smoke three to four more "bowls" of marijuana together (Id).  Dr. Ross found that Pillault had a focus on death and suicide (ROA.227) and at times fantasized about the Columbine School massacre (ROA.230).

Dr. Ross's clinical opinion regarding Pillault was that if he continued to abuse substances his risk for future dangerousness would be moderate to high, but his risk of dangerousness would be significantly reduced if he could remain sober (ROA.239). "Dangerousness" was considered to be any act of violence, not necessarily a school shooting (*Id.*).

Prior to and at the sentencing hearing, held on March 6, 2014, Pillault objected to the 6-level increase in his offense level for conduct evidencing intent to carry out such a threat (ROA.320-321). At the sentencing hearing both Doe and Roe testified to the conduct they witnessed, such as the detailed planning, testing pipe bombs and Molotov cocktails, and Pillault's plan to save money to purchase a gun (ROA.249-56, 279-89).

Pillault testified and denied all of the allegations made by Roe and Doe (ROA.292-307). Pillault testified that the threats were nothing more than "trolling," and that the grotesque pictures and rap lyrics were nothing more than jokes and doodles he made while "high" in custody (ROA.297-298, 308-309).

The court found the testimony of Doe and Roe more credible than Pillault's and overruled Pillault's objection to the 6-level enhancement under § 2A6.1(b)(1), finding that Pillault had taken steps to carry out the threat (ROA.320-321).

The court imposed a sentence of 72 months incarceration (ROA.328), varying from the Sentencing Guidelines out of the need to protect the public from Pillault (ROA.327). Pillault objected to the upward variance, in part, because he believed the court used the length of the sentence to afford him better access to drug treatment and rehabilitation, and also psychological treatment (ROA.330). The District Court expressly denied that as a factor, saying: "I didn't impose the length for that reason. I'm trying to protect the public…. I think I made that clear.

But you (Pillault's counsel) had requested that he get the treatment, so I am going along with that" (*Id.*). The court made special note of the psychiatric evaluation, which stated that Pillault's risk of future violence was mitigated "as long as he stays sober" (ROA.327). If not sober, the court found Pillault was "a possible high threat to someone, not necessarily school children, but to anyone who might cross his path" (ROA.327-328). But as the government pointed out, the last time he was sober before he was incarcerated was unknown (ROA.325).

Pillault appealed the 6-level enhancement under Section 2A6.1(b)(1) and the upward variance (ROA.185). The Fifth Circuit affirmed both the enhancement and the upward variance. *United States v. Pillault*, 783 F.3d 282 (5th Cir. 2015).

Pillault filed the instant § 2255 motion to vacate, a few days less than a year after the Fifth Circuit affirmed his sentence. Doc. 107. He was then released from Bureau of Prison's custody and began his term of supervised release on or about February 9, 2018.

U.S. Probation requested that Pillault's supervised release be revoked and Pillault was detained by the court on July 13, 2018. Doc. 113. The court revoked Pillault's supervised release on July 26, 2018. Doc. 119. According to the United States Bureau of Prison's inmate locator website, Mr. Pillault has a tentative release date of July 13, 2019.

### Ineffective Assistance of Counsel

Mr. Pillault's first ground for relief involves ineffective assistance of counsel. The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to her defense. Under the deficiency prong of the test, the petitioner

must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011).

In order to show prejudice arising from an attorney's ineffective assistance during the plea negotiations or the plea itself, Pillault must show that, absent his counsel's deficiencies, he would have proceeded to trial. *See United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000) (in order to show prejudice as a result of ineffective assistance during the guilty plea process, a defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial") (citing *Hill*, 474 U.S. at 59, 106 S. Ct. 366).

There is no evidence that supports a finding that Pillault's claim that his counsel committed errors or that, but for such errors, Pillault would have proceeded to trial. Indeed, the

instant motion reveals that he is mistaken regarding the direct appeal. Pillault's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody states that on appeal, his counsel "…only raised the issue of a Tapia violation…" (Pillault 2255 Motion, p. 3).

This statement is demonstrably false. Mr. Pillault's counsel raised several issues on appeal including: (1) an objection to a six-point enhancement under USSG 2A6.1, arguing that the enhancement was inappropriate because Pillault did not commit an overt act that was substantially and directly connected to the offensive threat, (2) that the district court's sentence was unreasonable because it did not account for the nature and circumstances of the offense, and (3) that the district court violated the *Tapia*[5] standard by giving significant weight to Pillault's need for treatment. *United States v. Pillault*, 783 F.3d 282, 286 (2015). These were rational arguments, though they did not ultimately win the day for Mr. Pillault, and counsel is not required to raise every colorable argument on direct appeal. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308 (1983).

Counsel's advice to plead guilty was sound. Had Pillault proceeded to trial and been convicted on both counts, he faced a maximum of fifteen years in prison. Under his plea agreement, the maximum sentence would have been 10 years and his guideline offense level reduced from 18 to 15 points, due to accepting responsibility for his criminal acts. (PSR ¶ 26-35). The court ultimately sentenced Mr. Pillault to 72 months, due in part to the government's Motion for Upward Variance, which sought the maximum penalty of ten years imprisonment. (Motion for Upward Variance ¶ 7).

---

[5] *Tapia v. United States*, 564 U.S. 319 (2011) .

Mr. Pillault understood when he pled guilty that there was no agreement regarding the sentence to be imposed, that it was at the court's discretion, and that the government reserved the right to file a motion for upward variance. (Plea Supp. ¶ 3). While Mr. Pillault and counsel may have hoped for a sentence within the guideline range of 18 to 24 months, the government's motion for upward variance and the judge's sentencing discretion were entirely beyond defense counsel's control. Mr. Pillault understood this when he changed his plea to guilty. (Plea Tr. 11-12).

Also, Mr. Pillault has not shown that, absent his counsel's deficiencies, he would have proceeded to trial. To provide effective assistance, counsel need only rely on a "realistic assessment" of the government's likelihood of acting in a defendant's favor. *McKee v. Harris*, 649 F.2d 927, 932 (2d Cir. 1981) ("The starting point for effective representation is a realistic assessment of the prospects of success in light of the risks of failure."). In *McKee*, the court stated that a defendant could not force the court to replace appointed counsel who had advised him to forgo trial and enter plea negotiations. *Id.* at 932. Counsel only has a duty to give a candid appraisal of a case, not to be optimistic about the possible outcome. *Id.*

Mr. Pillault's words during the plea hearing demonstrated his intention to plead guilty because he was factually guilty and that he was satisfied in both that decision and with the representation he was receiving from counsel. (Plea Tr. 5-7, 19-20). Pillault's sworn statements in open court are entitled to a strong presumption of verity. *United States v. Lampaziane*, 251 F.3d 519, 524 (5th Cir. 2001) (citing *Blackledge v. Allison*, 431 U.S. 63, 74, n. 4 (1977)). Indeed, the Fifth Circuit affords "great weight to the defendant's statements at the plea colloquy." *United States v. Cothran*, 302 F.3d 279, 283-84 (5th Cir. 2002). Mr. Pillault stated under oath that he

had an opportunity to discuss his case with counsel and that he was satisfied with the representation that he received.  (Plea Tr. 5).

Pillault's conclusory allegations and unsupported claims that counsel was ineffective are insufficient to establish ineffective assistance.  *United States v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007) (conclusory allegations and general claims are insufficient to establish ineffective assistance or to require an evidentiary hearing on that issue).  Indeed, the addendum to Mr. Pillault's PSR makes clear that Pillault's counsel carefully read it and made several objections to its content.  (Add. to PSR ¶ 1-3).  Counsel raised those issues and several others during sentencing and on direct appeal.  Mr. Pillault has not shown that counsel rendered ineffective assistance under the *Strickland* test.

Mr. Pillault also argues that he received ineffective assistance of counsel because he had no counsel present when his home was searched.  This claim is simply frivolous.  Mr. Pillault was not under arrest or in custody at the time; as such, he was not entitled to appointed counsel.  There is no requirement that counsel be present at the exact moment that a defendant is initially arrested or his home searched pursuant to a lawful warrant:  "[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him."  *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (Justice Stewart, with three Justices concurring and one Justice concurring in result.).

Mr. Pillault acknowledged that counsel could not guarantee a short sentence and that the government reserved the right to seek an upward variance in sentencing.  (Plea Tr. 10-12).  This is not deficient performance, and the ultimate sentence was outside of defense counsel's control.  Counsel's advice to plead guilty was also sound.  Had Pillault proceeded to trial, the weight of the evidence

against him would almost certainly have resulted in a guilty verdict, even if his "accuser" had refused to testify against him at trial. (Plea Tr. 12-17).

During sentencing, defense counsel tried to mitigate a finding of his dangerousness and to undermine the credibility of the witnesses against him. The witnesses included multiple former girlfriends, each of whom verified that Pillault had been planning to detonate explosives and shoot up Oxford High School, had idolized the Columbine shooters, and had done so for years. (Sentencing Tr. 44-46, 71-74).

The court found that the witnesses against Pillault were more credible than Pillault, himself. The court nonetheless found in favor of Pillault on several issues, finding that the proof did not establish that he had the ability to carry out the planned attack or possessed the means to purchase a shotgun. However, the court ultimately granted the government's motion for upward variance from the sentencing guidelines and imposed a 72-month sentence. (Sentencing Tr. 108-118).

The sentence the court imposed was beyond defense counsel's control, a fact that Pillault acknowledged when he pled guilty. (Plea Tr. 10-12). Pillault's counsel vigorously defended his client, preserved important issues for appeal, and tried to mitigate the sentence imposed. For these reasons, Mr. Pillault has not met the first prong of the *Strickland* test. Defense counsel performed well in the face of an extremely strong case for the prosecution.

### Pillault Cannot Show Prejudice

Mr. Pillault has not shown that counsel's performance caused prejudice to his legal position. Indeed, nothing in the record suggests that Pillault would have risked going to trial. The evidence against him was overwhelming, and he did not challenge the nature or amount of

the evidence, though he was reluctant to stipulate to witness statements about him occurring outside of his presence. (Plea Tr. 17-20). If Mr. Pillault had not pled guilty, the jury would surely have convicted him based on the overwhelming evidence against him. By pleading guilty, he avoided being charged with other offenses arising from the charge to which he pled guilty. (Plea Tr. 7-10). He avoided a significantly higher sentence and the possibility of facing other charges. He also benefited from a three-point reduction of his offense level during sentencing because he accepted responsibility for his criminal actions. He received a higher sentence than he or his counsel had hoped for; however, long before he pled guilty, he acknowledged that the government retained the right to file a motion for upward variance and that there was no guarantee of a lower sentence. (Plea Tr. 10-12).

Mr. Pillault also argued that counsel rendered ineffective assistance for failing to visit him in pretrial detention, failing to properly cross-examine witnesses during sentencing, and failing to take advantage of the accuser's alleged decision not to testify. First, there is no requirement that counsel visit a defendant in jail. Second, contrary to Mr. Pillault's bald assertion, the record reveals that defense counsel vigorously cross-examined the government's witnesses. Third, the government had marshaled sufficient evidence to convict Mr. Pillault, even if one of the witnesses had decided not to testify. None of these alleged deficiencies rises to the level of ineffective assistance of counsel, and these grounds for relief are without merit.

There is simply no evidence to support the actual prejudice prong of *Strickland*. The evidence against Pillault was overwhelming, and counsel's advice to plead guilty was sound. Defense counsel did a fine job and attempted to mitigate the severity of Pillault's sentence by cross-examining the government's witnesses during sentencing, making numerous cogent objections, and preserving issues

for appeal.  Mr. Pillault's claim that counsel's performance was deficient is without substantive merit and will be denied.

**Waiver of Counsel and Agreement to Speak With Investigators**

Mr. Pillault argues that his Fourteenth amendment right to due process was violated because arresting officers allegedly coerced him into both signing away his right to counsel and participating in an interview.  The alleged coercion, coupled with defense counsel's advice to plead guilty, led Mr. Pillault to believe that he had no defense, and no one defending his rights.

Mr. Pillault has offered nothing more than his bald assertion that the arresting officers coerced him into signing away his right to counsel before or during interrogation.  Such "conclusory allegations do not raise a constitutional issue in a habeas proceeding."  *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983).  As such, this claim for relief will be denied.

Pillault next claims that his attorney's advice to plead guilty was faulty and denied him his Fourteenth Amendment right to due process.  Pleading guilty does not deny a defendant of his due process rights – instead, with a guilty plea, a defendant waives certain constitutional rights, such as the right to trial by jury, as a necessary condition of making a guilty plea. *Brady v. United States*, 397 U.S. 742, 748 (1970).  With proper knowledge and understanding, guilty pleas provide a method to dispose of a case without a trial in a constitutional manner that upholds due process.  Mr. Pillault understood that he was surrendering this right and other important constitutional rights when he pled guilty.  (Plea Tr. 4-12).  "The rule that a plea must be intelligently made to be valid does not require that a plea be vulnerable to later attack if the defendant did not correctly assess every relevant factor entering into his decision." *Brady*, 397 U.S. at 757.  As discussed above, given the strength of the government's case against him,

counsel's advice to plead guilty was sound.  Mr. Pillault cannot show that counsel's performance on this issue was deficient or prejudiced his defense.  *Strickland*, 466 U.S. at 687.  Thus, this claim for relief must be denied.

### Threats as Protected Free Speech

Mr. Pillault argues that his First Amendment right to freedom of speech was violated because only his mother or a parental figure possesses the authority to censor his expressive activities on the internet.  He thus argues that his threatened acts of violence are protected under the First Amendment.

First Amendment protections are not, however, all-encompassing.  The government may restrict certain categories of speech without violating the First Amendment.  In this case, the government may prohibit true threats.  When evaluating a threat to determine if it constitutes protected speech, the court must consider its political nature, context, the manner in which the statement is received by its audience, and whether the statement is conditional in nature.  *Watts v. United States*, 394 U.S. 705, 708 (1969).  In the present case, Mr. Pillault transmitted threats to blow up Oxford High School and kill students, teachers, and administrators.  Such threats do not constitute protected speech.  In *Watts*, the speech was clearly political, conditioned on a certain event occurring (being drafted), and the audience laughed rather than taking the speech as a serious threat.  *Id* at 706-708.  In Mr. Pillault's case, there was no political message behind the speech.  He threatened to blow up Oxford High School, and expressed the desire to "blow[] brains out of skulls."  He told the audience to look for the last name "Pillault" in the news, expressed his obsession with the Columbine shooting, and specified that he intended to make good on his threat on the anniversary of the Columbine shooting.  The audience did not laugh.

Indeed, one audience member located in Virginia took the time to identify Pillault and contact the school resource officer at Oxford High School regarding the threat. The game developer (who was located in the United Kingdom), also forwarded Pillault's threatening messages – and independently reached out to the high school staff to warn of a credible threat. None of this constitutes political speech or words that the audience dismissed as mere hyperbole.

The speech had no conditions; it was not humorous or received as such by the audience; it held no political message, and the evidence shows that Mr. Pillault had planned and truly intended to build bombs and carry out a mass shooting at Oxford High School.

As the Supreme Court has noted, "the First Amendment permits a State to ban true threats … [which] encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (citing *Watts*, 394 U.S. at 708) (internal quotations omitted). The Court held that "the speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and the disruption that fear engenders, as well as from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 359-60 (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 388 (1992)). The Court noted that intimidation is a type of true threat where the speaker directs a threat to a person or group of persons with the intent to place them in fear of bodily harm or death. *Black*, 538 U.S. at 344. Pillault's threats to shoot up Oxford High School are clearly a type of true threat intended to place the listener and audience in fear of bodily harm or death. Mr. Pillault even made these same threats to shoot up and bomb Oxford High School to past girlfriends in a clear effort to intimidate them, demonstrating that his school shooting comments

in the Runescape online game chat were hardly a one-off event intended only as a joke. (Sentencing Tr. 41-45, 71-74).

Pillault's threats were not protected speech under the First Amendment. Pillault's comments constituted true threats. For these reasons, this claim should be denied on the merits.

### Consultation Before Executing the Search Warrant

Pillault asserts that his Fourth Amendment rights were violated by the search of his home at the time of his arrest because he was denied an interview for a determination of the facts prior to his arrest and the search of his home. This claim is frivolous, as there is no constitutional right to an interview prior to the search of one's home or possessions.

The arrest of Pillault and search of his home and computers were based upon legally issued warrants after findings of probable cause. The Fourth Amendment imposes two requirements on issuing warrants: (1) all searches and seizures must be reasonable, and (2) a warrant may not be issued unless probable cause is properly established, and the scope of the authorized search is set out with particularity. *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citing *Payton v. New York*, 445 U.S. 573, 584 (1980)).

The search of Pillault's home and seizure of his computers for examination were both reasonable. Pillault made threats to blow up Oxford High School and shoot students and administrators. These threats were communicated to the school and the school's resource officer by both a concerned citizen who witnessed Pillault's comments as they were made and by the game's developer. The threats were directly traced back to Pillault's home and computer. The school resource officer knew Pillault and in his professional opinion considered Pillault someone likely to follow through with that kind of threat. Examination of Pillault's computer that he used

to make the threats served to demonstrate whether he made the threats or not, as well as provide evidence regarding whether this was a serious threat. This search of Pillault's home and seizure of his computer were reasonable.

In this case, a young man in Virginia grew concerned about the threats he saw Pillault make in the Runescape chat and contacted the school resource officer at Oxford High School. The game developer also independently contacted authorities and provided transcripts of Pillault's threats, as well as information identifying Pillault's address and computer from which the threats originated. The information was reliable, and both informants had personal knowledge of the threats made by Pillault.

The school resource officer knew Pillault, including his tendency towards violence, bullying, and fighting, and moved to prevent a mass shooting of innocent school children. An arrest warrant was eventually issued for Pillault, and a search warrant for his home and his computer were also obtained. The issuing magistrate's decision to issue a warrant was based on a probable cause determination that was wholly reasonable given the available evidence and the totality of the circumstances. It was necessary to search Pillault's home and seize his computer to ensure that the threats had definitely come from it and had been made by Pillault.

Mr. Pillault's claim that law enforcement officers had a constitutional duty to provide him a chance to explain his side of the matter before searching his home and belongings is utterly frivolous. In this case law enforcement officers reasonably believed that Pillault was armed and preparing to use explosives or firearms against schoolchildren. The actions of the law enforcement officers and the court were reasonable and within the bounds of the law. This claim is frivolous and will be denied.

**The Claim of Actual Innocence Is Also Frivolous**

Mr. Pillault claims that he is actually innocent of the crime of his conviction; he has not, however, offered any proof or argument that would refute the evidence the government was prepared to introduce against him. In addition, at his change of plea hearing, he testified that he was pleading guilty because he was actually guilty – and agreed to the factual basis for his change of plea. Based upon the summary of the evidence set forth above, this ground for relief will be dismissed as frivolous.

## Conclusion

In sum, none of the Movant's claims has merit, and the instant motion to vacate, set aside, or correct sentence will be denied. A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 4th day of April, 2019.

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**